## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BETHANY R. SCAER, | : |
| Plaintiff, | : |
| v. | :    Case No. |
| ALISON V. MASTIN, Chair, Kearsarge Regional School Board, in her official and individual capacities; KEARSARGE REGIONAL SCHOOL BOARD; and KEARSARGE REGIONAL SCHOOL DISTRICT (SAU #65); | : |
| Defendants. | : |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

### INTRODUCTION

When Beth Scaer stood up at a Kearsarge Regional School Board meeting to urge compliance with a state law reserving women's sports for biological women, she expected hostility from the law's opponents in the audience. Scaer, though, did not expect the board chair to cut her off just seconds into her speech, rule her out of order, and threaten to have the police remove her if she kept talking.

Scaer's transgression? She described the male athlete at the center of discussion as a "tall boy." This, the chair said, violated the board's "no derogatory comments" rule. Except up until then, the board had no such rule. The supposed "no derogatory comments" rule nowhere appears in Kearsarge Regional School District's written

Case 1:25-cv-00183   Document 1   Filed 05/15/25   Page 2 of 23


policies. Instead, it seems to be an unwritten rule created just that night to censor public commenters.

That rule is unconstitutional. No ordinary person would think that referring to a young male athlete as a "tall boy" is derogatory. A ban on whatever the school board's chair considers "derogatory" is not only unreasonable, it impermissibly discriminates based on viewpoint. The Kearsarge Regional School Board cannot open its meetings for public comment and then censor those who choose to express their positions using words and rhetoric that the school board dislikes.

The board violated Plaintiff Beth Scaer's First Amendment rights when it enforced a vague, unwritten rule to prevent her—and only her—from expressing a viewpoint the board disliked. This Court should end Defendants' unconstitutional policy and practice, enjoin them from further enforcing the "no derogatory comments" rule, and award Scaer nominal damages to vindicate her constitutional rights.

## THE PARTIES

1.    Plaintiff Bethany R. Scaer is a natural person and a citizen of New Hampshire and the United States.

2.    Defendant Alison V. Mastin is the Chair of Kearsarge Regional School Board and has held that position at all times relevant to the events in this complaint. She is sued in her official and individual capacities.

3.    Defendant Kearsarge Regional School Board is a New Hampshire school board, consisting of nine members, which is the governing body of School

Administrative Unit 65. *Cf. Foote v. Manchester Sch. Dist.*, 152 N.H. 599, 603 (2005).

4.      Defendant Kearsarge Regional School District is School Administrative Unit 65, a New Hampshire school district comprised of the public schools serving seven New Hampshire towns (Bradford, Newbury, New London, Springfield, Sutton, Warner, and Wilmot). It is governed by the Kearsarge Regional School Board.

JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' claims arise under federal law and challenge Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

6.      Venue lies in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and are occurring in this judicial district and because all Defendants reside in this district.

STATEMENT OF FACTS

*Kearsarge Regional School District Policies on Public Comments*

7.      Kearsarge Regional School District maintains a written policy (Policy BEDH) that regulates "Public Comment & Participation at School Board Meetings."

8.      Exhibit A is a true and correct copy of Policy BEDH, as of March 11, 2025. The policy is also available on the school district's website at

https://www.kearsarge.org/district/school-board-mbc/pages/bedh-public-comment-participation-school-board-meetings.

9.     Under Policy BEDH, the Kearsarge Regional School Board "provide[s] the opportunity for members of the public to comment on school district matters at all regularly scheduled Board meetings" so that the Board can "hear the wishes and ideas of the public."

10.     Speakers "may offer comments on agenda items or other District matters (e.g., operations, budget, and other issues directly relating to the District's school policies, programs and operations.).." Individual speakers are each "permitted equal time" to comment and "allotted 3 minutes per person."

11.     Policy BEDH states that the school board "will not tolerate defamatory statements, comments threatening bodily harm, or other unprotected speech." The Chair may rule a speaker who violates these rules as "out of order," and "[r]epeated violations may result in the Chair terminating the speaker's privilege of addressing the Board" before that speaker's three-minute allotment is complete.

12.     Policy BEDH does not allow the public to disrupt meetings by, for instance, "[s]houting or speaking out of appointed time while someone else has been recognized" or "[a]ny other conduct intended to disrupt the meeting or person speaking."

13.     "[A]fter at least two warnings from the Chair," the Chair may direct a person disrupting the meeting to leave, involving law enforcement if necessary.

*The Controversy around House Bill 1205*

14.    During the 2023-2024 school year, Kearsarge Regional School District allowed M.J., a biologically male student, to compete on multiple girls' sports team. M.J. (then a sophomore) played goalie on the Kearsarge varsity girls' soccer team in the fall of 2023, and competed as a female athlete on the indoor track and field team during the winter 2024 season, winning the girls' Division II state title in high jump.

15.    In July 2024, the New Hampshire legislature passed, and the governor signed, House Bill 1205: a state law that limited participation in interscholastic women's sports teams to biological females.

16.    Plaintiff Beth Scaer and her husband Stephen Scaer advocated for House Bill 1205 before the state legislature. During this time, Beth Scaer saw and personally interacted with M.J., and Scaer also saw two other biologically male athletes (who would later become the two plaintiffs in the *Tirrell* case, discussed below). M.J. and the other two athletes advocated against the passage of House Bill 1205.

17.    About a month after the governor signed House Bill 1205, on August 15, 2024, the Kearsarge Regional School Board voted four to one (with three abstentions) to enforce the law, which prohibited M.J. and other biological males from competing in girls' sports.

18.    Exhibit B is a true and correct copy of Kearsarge Regional School Board's approved minutes for the August 15 meeting. These minutes are also available at

https://www.kearsarge.org/sites/g/files/vyhlif731/f/pages/15_aug_2024_minutes_app
roved.pdf.

19.    On August 22, 2024, a federal court issued a temporary restraining order
prohibiting the New Hampshire Department of Education, as well as various school
districts and school boards, from enforcing House Bill 1205. *See Tirrell v. Edelblut*,
Case No. 24-cv- 251-LM-TSM, 2024 U.S. Dist. LEXIS 150777 (D.N.H. Aug. 22,
2024).[1] The Kearsarge Regional School District is not a defendant in the *Tirrell* case
and was not among the districts enjoined.

*The August 29 School Board Meeting*

20.    Kearsarge Regional School Board announced that, in light of the court's
ruling in the *Tirrell* case, it would revisit its decision to enforce House Bill 1205 at
its regularly scheduled school board meeting on August 29, 2024.

21.    Beth Scaer attended the August 29 meeting with her husband, Stephen,
to urge the Kearsarge school district to follow House Bill 1205 during its public-
comment period.

22.    An inordinately large number of people (including both supporters and
opponents of House Bill 1205) attended the school board meeting. Many attendees
displayed signs—some in the parking lot and some in the room during the meeting

---

[1] The district court in *Tirrell* followed up on the restraining order with a
preliminary injunction a few weeks later, after the Kearsarge board meeting at
issue in this case. *See Tirrell v. Edelblut*, Case No. 24-cv- 251-LM-TSM, 2024 U.S.
Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024).

itself. At least one of the signs displayed in the room during the meeting referred to M.J. by name, stating "Let [M.J.] Play."[2]

23.    Exhibit C is a true and correct copy of Kearsarge Regional School Board's approved minutes for the August 29 meeting. These minutes are also available at https://perma.cc/LK58-T8BP.

24.    The public-comment period was the first order of business on the agenda. Alison Mastin, the school board Chair, began the comment period by informing speakers about the rules of order.

25.    According to Mastin, all speakers had to raise their hand to speak; state their name and the town in which they reside; limit comments to three minutes or less; and "not speak derogatorily about anyone or anything."

26.    Approximately fifteen speakers addressed the board during the public-comment period. Some addressed the school board via Zoom, but most did in person. With the exception of Plaintiff Beth Scaer, everyone who wanted to comment was permitted to speak for the full three minutes.

27.    M.J. attended the meeting and spoke second during the public-comment period. M.J. spoke about how House Bill 1205 had upended his life and urged the school board to allow him to compete on Kearsarge's girls' soccer team during the fall 2024 season, which was about to commence, just as he had the year before.

28.    Most of the public commenters spoke in favor of the school board violating the state law and permitting M.J. to compete. Commenters expressed support for

---

[2] The sign used M.J.'s first name, here redacted as M.J. remains a minor.

M.J. specifically and, at times, described personal interactions that they had had with M.J.

29.    Commenters, both those who supported House Rule 1205 and those who opposed it, spoke about whether permitting M.J. to play on the girls' soccer team would increase the injury risk for biologically female players.

30.    Stephen Scaer, the plaintiff's husband, was one of the few commenters to speak in support of reserving girls' sports for biological women. He discussed the physiological differences between males and females and the need to protect children from experimental gender medicine for his full three minutes.

31.    Beth Scaer rose to speak towards the end of the public-comment period. She intended to use her three minutes primarily to read a short New Hampshire Journal article published earlier that year. This article discussed M.J.'s victory in the girls' high jump at the state track and field championship.

32.    Exhibit D is a true and correct copy of the New Hampshire Journal article that Beth Scaer brought to the meeting.

33.    Before reading aloud from the article, Scaer gave a short, off-the-cuff explanation of why she would read the article. Scaer intended to read this article to discuss how the participation of M.J. and other post-pubescent male athletes in girls' sports created a risk of injury to female players and also placed biological female athletes at a competitive disadvantage.

34.    Scaer contrasted the physique of the two plaintiffs in *Tirrell v. Edelblut* with M.J.'s physique. Scaer noted that the plaintiffs in *Tirrell* were small and their

participation in girls' soccer did not represent a threat to girls' safety or significantly undermine the fairness of the competition.

35.    Scaer had seen the *Tirrell* plaintiffs in the past and knew they were small. According to public reports, they had been on puberty blockers for over a year and had never experienced male puberty.

36.    Scaer, gesturing towards M.J., then told people in the room to "look at him." Scaer then referred to M.J. as a "tall boy," in contrast to the *Tirrell* plaintiffs, who play in other districts.

37.    M.J. was sitting two rows in front of Beth and Stephen Scaer at this time, approximately 10 feet away.

38.    M.J. has gone through male puberty. He is close to 6 feet tall—much taller than an average biological female—and has considerable musculature. Scaer had seen M.J. in the past, as well as that night, and knew his physical appearance.

39.    Immediately after Scaer referred to M.J. as a "tall boy," Mastin interrupted and disallowed Scaer from saying anything further. This interruption occurred no more than thirty seconds into Scaer's allotted three minutes of speaking time.

40.    According to Mastin, Scaer had violated the school board's "no derogatory comments" policy. Mastin ruled Scaer out of order, declared the remainder of her three minutes forfeited, and stated that she would be removed by the police if she continued to speak. Mastin was visibly angry at Scaer.

41.    Mastin did not explain on August 29 exactly what part of Scaer's speech violated the "no derogatory comments" policy. Scaer later learned, from Kearsarge Regional School District's published minutes for the meeting, that Mastin "deemed [Scaer's] comment" calling M.J. a "tall boy" to be the violation.

42.    While Scaer was speaking, many attendees in the meeting room held signs in support of M.J., and they jeered, and hissed to express their opposition to Scaer's comments. Some audience members applauded Mastin for interrupting Beth and cutting her off early.

43.    Scaer attempted to protest Mastin's silencing her, but—due to the jeers, hissing, and applause—it was difficult to hear Scaer. Mastin and the school board made no attempt to quiet the crowd so that Scaer's comments could be heard.

44.    Scaer turned in a copy of the New Hampshire Journal article that she had planned to read to the meeting's clerk as written evidence. Scaer then sat back down.

45.    After the public comment period ended, the school board voted five to one (with one abstention) to reverse its earlier August 15 decision, defy state law, and permit M.J. to compete on the girls' soccer team. M.J. played on the Kearsarge varsity girls' soccer team throughout the fall 2024 season.

*The Aftermath of the August 29 Meeting*

46.    Approximately two months later, Scaer attended the Kearsarge Regional School Board's October 24 meeting and spoke during the public comment period.

47.    Prior to this meeting, Scaer wrote out prepared comments, to avoid any content that she thought the board might consider "derogatory" and might use to silence her again.

48.    During her public comments in October, Scaer complained that the minutes for the August 29 meeting were incomplete because these minutes did not include all the information required under New Hampshire's public meetings law. In particular, the minutes lacked the names of commenters who spoke in favor of following House Bill 1205 and did not summarize the statements that these commenters had made.

49.    During these October 24 comments, Scaer also again urged Kearsarge Regional School District to follow the law and prevent biological males from playing girls' sports. She did not, however, name M.J. in these October 24 comments or describe his physical appearance. Had it not been for the board's prior censorship, she would have made similar comments detailing her specific concerns with athletes such as M.J. competing due to their physical size and the risks of harm to female athletes caused by that physical advantage.

50.    Scaer refrained from addressing another issue at the October 24 meeting out of fear she would be censored again. In March 2024, M.J.'s father was convicted of child pornography but continued to attend soccer games through November 2024, while out on bail during his pre-incarceration release. *Cf. United States v. Jacques*, Case No. 24-cr-19-PB-TSM-19, 2024 U.S. Dist. LEXIS 207481 (D.N.H. Nov. 15, 2024). Kearsarge Regional School District allowed M.J.'s father to attend these

games. Some parents complained at the October 24 meeting that the presence of a convicted child sex offender threatened the safety of students and objected to Kearsarge Regional School District's handling of the situation. Beth Scaer did not address this issue in her public comments because she worried the Chair would stop her from speaking.

51.     The school board later put out and approved a revised version of the August 29 minutes (see Exhibit C), which included the required information that had been missing.

52.     In February 2025, the New Hampshire Interscholastic Athletic Association (NHIAA), the governing authority regulating competitive high school sports in the state, advised schools that they have a responsibility to follow state and federal law by limiting girls' sports teams to biological women.

53.     After receiving this advice from the NHIAA, Kearsarge Regional School District announced that it would no longer permit biological males to compete on girls' sports teams.

*The Impact of Defendants' Actions on Plaintiff*

54.     Beth Scaer intends to publicly comment at future Kearsarge Regional School Board meetings, in order to express her views on the role of transgender ideology as it relates to the operation of public schools' operation, including her opposition to the school's former policy permitting M.J. and biological males to participate in girls' sports.

55.    Although Kearsarge Regional School District currently reserves girls' sports to biological females, Kearsarge has changed its policy regarding transgender sports participation multiple times in the past. Scaer fears that the school board might return to its former policy, especially if federal law changes again in the future.

56.    She wants to criticize Kearsarge's former policy on transgender athletics using language the board may find offensive and derogatory, such as by describing the physical appearance of biological males like M.J. who want to compete in girls' sports.

57.    Scaer also intends to comment publicly to criticize the school board's past treatment of her. She believes that the school board's public-comment policy violates the First Amendment, and she intends to criticize that policy and Chair Alison Mastin's actions using language that the school board may find offensive and derogatory.

58.    Scaer also intends to comment upon Kearsarge's policy governing biological males accessing female bathroom and locker room facilities, and its handling of M.J.'s father's child pornography conviction. She intends to give these comments using language the board may find offensive and derogatory.

59.    In future public comments, Scaer intends to express herself in the same way that she did on August 29, referring to tall boys as "tall boys" or using similar expressions to describe their physical appearance when relevant.

60.     Scaer refuses to use preferred pronouns and will refer to an individual's biological gender when relevant to her public comments, even if Mastin or other members of the school board find it offensive.

61.     Scaer believes, however, that Mastin and the Kearsarge Regional School Board will not allow her to express her positions using the language that she wishes because they believe her comments are offensive and violate the board's unwritten "no derogatory comments" policy. Scaer believes that, if she were to speak as she wishes, Mastin or another board member would again interrupt her, prohibit her from speaking, threaten police removal, and forfeit her time.

62.     To speak again, Scaer believes that she would need to self-censor, as she did in her October 24 comments, and to avoid anything that could be characterized as derogatory.

63.     Scaer also believes that, if she were to speak as she wishes, Mastin and the Kearsarge Regional School Board would allow other attendees to disrupt her comments by hissing, jeering, and making similar noises, as Mastin did before, even though Policy BEDH forbids attendees from speaking out of turn or disrupting the person speaking.

64.     Scaer finds it frustrating and degrading to have her comments cut short as they were on August 29, especially because other speakers were allowed to promote their viewpoints and express support of M.J. Indeed, audience members were allowed to hold signs supporting M.J. (even by name), to hiss in opposition to Scaer's comments, and to applaud Mastin's censorship.

65.    To avoid another humiliating experience in the future, Scaer is refraining from publicly commenting at Kearsarge Regional School Board meetings on transgender issues in the same way she did on August 29. For the same reason, she is refraining from giving comments about M.J.'s father and how the board treated her when it censored her and allowed others to disrupt her comments.

66.    Unless Scaer obtains protection from the Court, Scaer does not intend to speak about transgender issues, M.J.'s father, or her past treatment using the language that she prefers at future Kearsarge Regional School Board meetings.

COUNT ONE
VIEWPOINT DISCRIMINATION, FACIALLY AND AS APPLIED
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

67.    Plaintiff realleges and incorporates by reference paragraphs 1 through 66.

68.    The public-comment period at Defendant Kearsarge Regional School District's board meetings constitutes a limited public forum for private speech by the general public because the board opens it up for members of the public to comment on school district matters and to apprise the board of the public's wishes, ideas, and factual information. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983); *Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002); *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 92 & n.13 (D. Me. 2022) (collecting cases).

69.    "Under the . . . First Amendment . . . government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*,

408 U.S. 92, 96 (1972). "Once it has opened a limited forum . . . the State must

respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of*

*the Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal quotation marks and citations

omitted). "[I]n a limited public forum, government '[c]ontrol over access to [the]

forum can be based on subject matter and speaker identity so long as the

distinctions drawn are reasonable in light of the purpose served by the forum and

are viewpoint neutral.'" *McBreairty*, 616 F. Supp. 3d at 93 (quoting *Cornelius v.*

*NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

70.    The same rules apply even if Kearsarge Regional School Board's public

comment periods are deemed nonpublic fora. *Minn. Voters All. v. Mansky*, 585 U.S.

1, 11-12 (2018). Regulations restricting First Amendment expression in a nonpublic

forum "must still be both viewpoint neutral and reasonable to be constitutional."

*Del Gallo v. Parent*, 557 F.3d 58, 72 (1st Cir. 2009),

71.    "If there is a bedrock principle underlying the First Amendment, it is that

the government may not prohibit the expression of an idea simply because society

finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414

(1989). "Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017)

(plurality opinion). Allegations of hurt feelings, real or spurious, do not justify

censorship of public comments. "Restrictions that bar offensive or otherwise

unwelcome speech are impermissible, regardless of the forum in which the

government seeks to impose them." *Moms for Liberty v. Brevard Pub. Sch.*, 118

F.4th 1324, 1334 (11th Cir. 2024).

72.    Defendants' "no derogatory comments" rule facially discriminates based on viewpoint. It bans comments the board deems offensive and otherwise "defy" the board's "sense of decency or propriety." *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019). "The facial viewpoint bias in [the policy] results in viewpoint-discriminatory application." *Id.* Defendants applied it to discriminate against Plaintiff to prevent her from giving public comments that express disfavored views the Defendants consider "derogatory," even when the First Amendment protects such speech. Defendants do not prohibit public commenters from expressing all viewpoints on transgender athletics nor from commenting on specific transgender athletes, even by name. By singling out those whose comments on the topic are deemed offensive or derogatory, Defendants have applied their policies in a way that discriminates based on viewpoint in violation of the First Amendment.

73.    Defendants have also selectively enforced the "no derogatory comments" rule and the non-disruption provisions of Policy BEDH in a viewpoint discriminatory manner. Defendants have applied these policies in a way that allows them to prevent public comments with content or rhetorical style they dislike, or which they believe would offend the board or many people in the audience. Commenters expressing popular or majoritarian opinions are protected from disruption and allowed to make offensive statements, but commenters expressing dissenting viewpoints are interrupted and drowned out by disruptive audience members that Defendants do not quiet and implicitly encourage.

74.    By enforcing the rule against derogatory comments, Defendants, under color of law, deprived and continue to deprive Plaintiff of her rights to freedom of speech and freedom of petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and is entitled to damages; declaratory relief; a permanent injunction against continued enforcement and maintenance of Defendants' unconstitutional rule against derogatory comments; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TWO
UNREASONABLE RESTRICTION, FACIALLY AND AS-APPLIED
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

75.    Plaintiff realleges and incorporates by reference paragraphs 1 through 66.

76.    In both a limited public forum and a nonpublic forum, government restrictions on speech and petition must be "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806. In a forum designed for "constructive dialogue through the public's comments," reasonableness is "necessarily a more demanding test than in forums that have a primary purpose that is less compatible with expressive activity." *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 636 (D.C. Cir. 2024) (internal quotation marks omitted).

77.    Defendants' restriction on "derogatory" comments is incapable of reasoned application, lacks sufficient implementation guidance, and is not reasonably related the purposes of the limited public forum. *See, e.g.*, *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 497 (6th Cir. 2020). It is unreasonable for

Defendants to prevent commenters from referring to the sex and physical appearance of another person, when that person's biological sex and physical appearance is relevant to a specific agenda item or other school district matters under discussion at the meeting.

78.    By unreasonably restricting public comment at school board meetings, Defendants, under color of law, deprive Plaintiff of her rights to freedom of speech and freedom of petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and is entitled to damages; declaratory relief; a permanent injunction against continued enforcement and maintenance of Defendants' unconstitutional rule against derogatory comments; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT THREE
VAGUENESS AND EXCESSIVE ENFORCEMENT DISCRETION – SPEECH CODE
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

79.    Plaintiff realleges and incorporates by reference paragraphs 1 through 66.

80.    The First and Fourteenth Amendments prohibit vague laws that chill protected speech. A law can be "impermissibly vague for either of two independent reasons" under the First Amendment. *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citation omitted). "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.*

81.    Defendants' prohibitions of comments that "speak derogatorily about anyone or anything" is unduly vague, lacks any definition of "derogatory" or

objective standard, and it is inherently subjective, serving only to authorize

Defendants' arbitrary censorship of speech they dislike. This policy is

unconstitutionally vague and gives excessive enforcement discretion to school

leaders. *Cf. Mansky*, 585 U.S. at 21-22.

82.    By enforcing this policy, Defendants, under color of law, deprive Plaintiff

of her rights to freedom of speech, freedom of petition, and due process in violation

of the First and Fourteenth Amendments to the United States Constitution.

Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and entitled to damages;

declaratory relief; a permanent injunction against continued enforcement and

maintenance of Defendants' unconstitutional rule against derogatory comments;

and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FOUR

OVERBREADTH – SPEECH CODE, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

83.    Plaintiff realleges and incorporates by reference paragraphs 1 through 66.

84.    Speech regulations may not "sweep unnecessarily broadly and thereby

invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307

(1964). "The showing that a law punishes a substantial amount of protected free

speech, judged in relation to the statute's plainly legitimate sweep, suffices to

invalidate *all* enforcement of that law, until and unless a limiting construction or

partial invalidation so narrows it as to remove the seeming threat or deterrence to

constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19

(2003) (internal quotation marks and citations omitted) (emphasis original).

85.    Defendants' no derogatory comments rule empowers Defendants to censor any speech they subjectively consider offensive. The rule is not confined to prohibiting unprotected speech, such as true threats or defamation. Rather, the rule bans all comments that the Board finds offensive or derogatory, even when the comments are protected speech about matters relevant to the purpose of the forum.

86.    Defendants' policy violates the First Amendment right of free speech on its face because it is substantially overbroad, sweeping in vast amounts of protected political expression.

87.    By enforcing this policy, Defendants, under color of law, deprive Plaintiff of her rights to freedom of speech and freedom of petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983 and is entitled to damages; declaratory relief; a permanent injunction against continued enforcement and maintenance of Defendants' unconstitutional rule against derogatory comments; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered in her favor and against Defendants as follows:

1. Issue an order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from:

a. Enforcing Kearsarge Regional School District's "no derogatory comments" policy;

b. Enforcing Policy BEDH in a manner that prevents public commenters at Kearsarge Regional School Board meetings from expressing viewpoints on political or social issues that are offensive or derogatory, when those viewpoints are relevant to agenda items or school district matters under discussion; and

c. Discriminating against speech at Kearsarge Regional School Board public comment periods on the basis of viewpoint, or on the basis of content that is non-disruptive and germane to the purposes of the meeting;

2. Declaratory relief consistent with the injunction, to the effect that:

a. Kearsarge Regional School District's "no derogatory comments" policy violates the First Amendment and Fourteenth Amendments' rights of speech and petition; and

b. Defendants violated Plaintiff's First Amendment rights by enforcing the "no derogatory comments" policy against Plaintiff;

3. An award of nominal damages in the amount of $17.91;

4. Cost of suit, including attorney fees and expenses pursuant to 42 U.S.C. § 1988; and

5. Any other relief as the Court deems just and appropriate.

Dated: May 15, 2025                    Respectfully submitted,

By:   */s/ Roy S. McCandless*

Nathan Ristuccia*[3]                    Roy S. McCandless
Virginia Bar No. 98372                  New Hampshire Bar No. 11850
Brett Nolan*                            ROY S. MCCANDLESS, ESQ., PLLC
DC Bar No. 90014964                     125 North State Street
INSTITUTE FOR FREE SPEECH               Concord, New Hampshire 03301
1150 Connecticut Avenue, N.W.           603.841.3671, Ext. 101
Suite 801                               roysmccandless@gmail.com
Washington, DC 20036
202.301.3300
nristuccia@ifs.org
bnolan@ifs.org

* Application pro hac vice to be filed

---

[3] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).